IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 20, 2020 Session

## IN RE RIVER L. ET AL.

**Appeal from the Juvenile Court for Fentress County**
**No. 2018-JV-160      Michael Todd Burnett, Judge**

___

### No. M2019-02049-COA-R3-PT

___

A mother appeals the juvenile court's decision to terminate her parental rights based on four statutory grounds. She also challenges the juvenile court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the children. We affirm the juvenile court's termination of the mother's parental rights.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Evan Matthew Wright and Emily Elizabeth Wright, Jamestown, Tennessee, for the appellant, Karen C.

Herbert H. Slatery, III, Attorney General and Reporter, and Matthew Daniel Cloutier, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Amber Rhea Clark, Clarkrange, Tennessee, guardian ad litem.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Ryder and River were born in 2010 and 2013, respectively, to Karen C. ("Mother") and Richard L., ("Father").[1] On April 18, 2017, the Tennessee Department of Children's Services ("DCS" or "the Department") received a referral alleging that Mother was abusing drugs. The Department began investigating the referral and made multiple attempts to

___

[1] The juvenile court terminated Father's parental rights, but he did not appeal the termination.

locate Mother but was unable to locate her for several weeks. While searching for Mother, DCS learned that Ryder had issues related to truancy. Mother failed to appear in court for Ryder's truancy hearing on May 3, 2017, and a truancy warrant issued for her arrest. She was arrested for that warrant the following day. Upon her arrest, Mother was also charged with child abuse because Ryder told the arresting officer that Mother "had hit him in the mouth."

The Department met with Mother in jail the day after her arrest. During this meeting, the DCS caseworker asked Mother to submit to a drug screen, but Mother was unable to produce a specimen at that time. Ultimately, Mother submitted to a drug screen given by her probation officer and tested positive for methamphetamine. The Department then met with Ryder about the child abuse allegation. Ryder disclosed to a case worker that Mother "hit him in his mouth because he was talking" and that she often disciplined him with a switch. Ryder further disclosed that he observed Mother "use needles and shots" to take "medicine." He described Mother as taking her medicine by putting a "needle in the middle of the arm."

On May 5, 2017, immediately after meeting with Mother and Ryder, DCS filed a petition for dependency and neglect. That same day, the juvenile court found that probable cause existed to believe that the children were dependent and neglected and placed them in DCS's custody. The court heard the petition for dependency and neglect on July 10, 2017, and entered an order adjudicating the children dependent and neglected and ordering that they remain in DCS's custody.

On June 13, 2017, DCS developed an initial permanency plan to address several of Mother's issues including housing, substance abuse, and mental health. The juvenile court ratified that plan on July 10, 2017. Following Mother's release from jail, DCS sought to assist her with the requirements of the permanency plan but was unable to locate her. The Department developed a second permanency plan on December 14, 2017. When the juvenile court ratified that plan on February 18, 2018, Mother was again incarcerated. Thereafter, Mother was released from jail, and the Department once more sought to assist her with the requirements of the permanency plans. The Department attempted to reach Mother by telephone and Facebook Messenger on a monthly basis but was unable to establish contact with her. The requirements of the permanency plans will be discussed later in this opinion.

The Department filed a petition to terminate Mother's parental rights on July 27, 2018. After a one-day trial, the juvenile court entered an order terminating Mother's parental rights. The court determined that the following grounds for termination had been proven by clear and convincing evidence: (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, (3) persistence of conditions, and (4) failure to manifest an ability and willingness to assume custody of the

children. The court further determined that termination of Mother's parental rights was in the children's best interest.

Mother appealed and presents the following issues: whether the juvenile court erred in finding by clear and convincing evidence that grounds existed to terminate her parental rights, whether the juvenile court erred in determining that termination of her parental rights was in the best interest of the children, whether the juvenile court abused its discretion in its rulings on the admissibility of evidence, and whether the juvenile court's evidentiary rulings denied her due process.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights

may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

ANALYSIS

I. Evidentiary Issues.

We begin by addressing the numerous evidentiary issues raised by Mother. A decision regarding the admission or exclusion of evidence falls within the sound discretion of the trial court. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008); *In re Kandace D.*, No. E2017-00830-COA-R3-PT, 2018 WL 324452, at *10 (Tenn. Ct. App. Jan. 8, 2018). Therefore, appellate courts decline to disturb a trial court's ruling on evidence absent an abuse of discretion. *Banks*, 271 S.W.3d at 116. A court abuses its discretion when it "'applie[s] incorrect legal standards, reache[s] an illogical conclusion, base[s] its decision on a clearly erroneous assessment of the evidence, or employ[s] reasoning that causes an injustice to the complaining party.'" *Id.* (quoting *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). "Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999); *see also In re Kandace D.*, 2018 WL 324452, at *10.

A. Drug screen report.

Mother first contends that a report containing the results of one of her drug screens constituted "a hearsay skunk" and should not have been admitted to prove that she failed to address her substance abuse issues. During direct examination, Mother's probation officer, Terry Hall, testified that, as part of his duty as a probation officer, he would usually meet with a client once a month and drug screen the client if he felt it was necessary. He met with Mother when her probation case was first assigned to him, but he did not administer a drug screen to her during that meeting because he felt it was unnecessary. Mr.

- 4 -

Hall did not meet with Mother again in the months that followed because she failed to report as required. Thus, he did not administer any drug screens to her during that time.

Mr. Hall stated that the first drug screen report he had in Mother's case file was dated October 18, 2017, the date of one of her arrests. He acknowledged that he did not administer that drug screen to Mother. Instead, employees of the Fentress County jail administered it. Mr. Hall merely had a copy of the report showing the results of that drug screen. When Mr. Hall began to testify about the results contained in the report, Mother's attorney objected on the basis of hearsay. The Department responded that the business records exception to the hearsay rule applied to the drug screen report and argued as follows:

> Your Honor, [Mr. Hall] just testified that it's part of his duty as a probation officer to meet with a client once a month and drug-screen. And I would think that those requirements create a duty to him to inquire about any drug screens that an officer performed on his client - - on his case load. That is knowledge that is required for him to do his job to maintain a probation officer status.

Without any further foundation, the juvenile court allowed Mr. Hall to testify that the report showed that Mother failed the October 18, 2017 drug screen.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tennessee Rule of Evidence 803(6) contains what is commonly referred to as the business records exception to the hearsay rule and provides as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

This exception "rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable." *Alexander v. Inman*, 903 S.W.2d 686,

700 (Tenn. Ct. App. 1995). "Its purpose . . . is to facilitate the use of business records by eliminating the expense and inconvenience of calling numerous witnesses involved in the preparation and maintenance of the records." *Id.* For this exception to apply, the party offering a business record into evidence must either provide a properly certified copy of the record or lay the appropriate foundation for the admission of the business record, "as shown by the testimony of the custodian or other qualified witness." TENN. R. EVID. 803(6); *see also Alexander*, 903 S.W.2d at 700. To be considered qualified, "the witness must have knowledge of the method of preparing and preserving the business records at issue" and "must be able to testify as to the identity of the record, the mode of preparation, and whether the record was made in the regular course of business at or near the time of the event recorded in the business record." Neil P. Cohen et al., TENNESSEE LAW OF EVIDENCE, § 8.11[11] (6th ed. 2011); *see also Alexander*, 903 S.W.2d at 700.

Here, the Department did not offer into evidence a certified copy of the October 18, 2017 drug screen report from the Fentress County jail. Instead, DCS introduced that record through Mr. Hall's testimony. Mr. Hall was not the custodian of that record. As a probation officer, he may well have been personally familiar with the Fentress County jail's record-keeping systems and procedures as they related to drug screens, which could have made him a qualified witness. The Department, however, failed to elicit testimony from him to lay a foundation showing that he possessed the necessary information to make him a qualified witness. As a result, DCS failed to meet the requirements of Tenn. R. Evid. 803(6), and Mr. Hall should not have been allowed to testify about the October 18 2017 drug screen report.

We note that Tennessee Rule of Appellate Procedure 36(b) provides, in pertinent part:

> A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

The record before us contains alternative evidence that clearly and convincingly supports the juvenile court's finding that Mother failed to address her substance abuse issues. In addition to testifying about the October 18, 2017 drug screen, Mr. Hall testified that Mother submitted to another drug screen on October 24, 2018 (approximately four months prior to trial), and she failed that drug screen.[2] Moreover, Mother admitted to failing that drug screen and to incurring an additional charge for drug possession shortly before the

---

[2] In her appellate brief, Mother asserts that the October 24, 2018 report, like that from October 18, 2017, was inadmissible hearsay. Although Mr. Hall stated that the report of the October 24, 2018 drug screen results was provided by the jail personnel who performed the drug screen on Mother while she was in jail, Mother failed to object to this report as inadmissible hearsay at trial. Thus, this argument is waived.

termination hearing.  We conclude, therefore, that any error the juvenile court committed in admitting hearsay evidence relating to the October 18, 2017 drug screen report was harmless due to alternative competent evidence supporting the judgment.

### B.  Statements about the October 18, 2017 drug screen heard by DCS case worker.

Next, Mother contends that the juvenile court abused its discretion in allowing Nina Hargis, a DCS case worker, to testify about the results from the October 18, 2017 drug screen discussed above.  Ms. Hargis was present in the courtroom during Mr. Hall's testimony and overheard him testify about the results contained in the October 18, 2017 drug screen report.  During direct examination, DCS asked Ms. Hargis what she heard Mr. Hall state regarding the results of the drug screen.  Mother raised a hearsay objection which the juvenile court overruled, finding Mr. Hall's statements about the results of the drug screen were not hearsay.

As previously mentioned, hearsay is "a statement, *other than one made by the declarant while testifying at the trial or hearing*, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c) (emphasis added).  Mr. Hall made the statements about the October 18, 2017 drug screen report at the termination hearing.  Therefore, the juvenile court correctly found that they were not hearsay, and Ms. Hargis could testify to what she heard him say during the hearing. Her testimony regarding what she heard in court, however, should not have been considered as substantive proof that Mother failed the October 18, 2017 drug screen because the drug screen report should not have come in during Mr. Hall's testimony due to DCS's failure to satisfy the requirements of the business records exception and because Mother objected to the report. *See generally* 1 MCCORMICK ON EVID. § 54 (8th ed.) ("If the testimony is received without objection, the testimony becomes part of the evidence in the case" and "may be relied on in argument; and alone or in part it can support a verdict or finding.")  Allowing the statements to be considered as substantive proof would permit DCS to ram the inadmissible drug screen report through the back door.[3]  However, because the record contains alternative admissible

---

[3] Mother also contends that the juvenile court erred in considering testimony from another DCS case worker, Brittany Massey, about Mother failing two drug screens.  Initially, Ms. Massey claimed to have personally administered two drug screens to Mother which returned positive for drugs.  During cross-examination, however, Ms. Massey admitted that she did not personally administer any valid drug screens to Mother. Rather, the drug screens she referenced were administered by someone else.  She knew the results of those drug screens because Mr. Hall provided her with them.  On appeal, Mother contends that the juvenile court should not have considered this testimony because it constituted hearsay—the same hearsay to which Mother had already objected during Mr. Hall's testimony.  A thorough review of the record shows that the first drug screen Ms. Massey refers to was dated May 5, 2017, the day DCS first contacted Mother.  Mother does not identify where in the record she objected to that particular drug screen report as hearsay, and we have found no such objection.  *See* TENN. R. APP. P. (27)(a)(7).  Furthermore, it is unclear from Ms. Massey's testimony whether the second drug screen she referred to was from October 18, 2017, or October 24, 2018, or from some other date.  Thus, we are unable to discern whether this second drug screen she references was, indeed, one to which Mother objected.  Nevertheless, if the juvenile court improperly

evidence regarding Mother's continued substance abuse, we conclude that any error committed by the admission of Ms. Hargis's testimony relating to the drug screen report was harmless.

### C. Exhibit 29.

Next, Mother contends that the juvenile court abused its discretion in admitting Exhibit 29 into evidence. Exhibit 29 is a document printed from the website mississippi.arrests.org that contains information purportedly relating to one of Mother's prior arrests. At the outset of the termination hearing, DCS included Exhibit 29 in a stack of exhibits it distributed for the juvenile court and Mother to discuss before admitting the exhibits into evidence. Mother objected to Exhibit 29 based on hearsay. The juvenile court entered the exhibit for identification purposes only and reserved the issue of whether to admit the exhibit into evidence until such time as it was addressed in the testimony.

During Ms. Hargis's testimony, DCS again attempted to admit Exhibit 29 into evidence, and Mother renewed her objection to the document as inadmissible hearsay. Relying on the business records exception, DCS responded as follows:

> Your Honor, just to reemphasize the exception to the hearsay rule, it allows for business records that are kept in the ordinary course of DCS business - - which I think I've already laid the foundation for - - would show that it's an exception to hearsay to allow the document, such as this, to come in under that rule.

The juvenile court determined that Exhibit 29 should not be admitted into evidence because the document was not self-authenticating under Tenn. Rs. Evid. 901 and 902 and because DCS failed to lay the appropriate foundation for the admission of the document as a business record due to Ms. Hargis being neither the custodian of the record nor a qualified witness capable of authenticating the document. Because the juvenile court did not, in fact, permit DCS to admit Exhibit 29 into evidence for the purposes of proof, Mother's argument on this issue is without merit.

### D. Exhibit 35.

Mother next asserts that the juvenile court abused its discretion in admitting Exhibit 35 into evidence during the guardian ad litem's cross-examination of the children's foster mother, Rhonda F. ("Foster Mother"). Exhibit 35 is a letter from a doctor addressed to "Guardian of River." The letter explains River's medical diagnosis and provides the date

---

admitted this testimony, the error was harmless because the record contained alternative proof clearly and convincingly supporting the juvenile court's finding that Mother failed to address her substance abuse issues.

he was last seen by the doctor.  When Mother objected to the letter as inadmissible hearsay, the attorney for DCS offered the following puzzling response:

> Your Honor, I think - - it's addressed to the guardian.  I think she [Foster Mother] can answer questions about how she needs to care for this child's medical needs.  But one of the - - she's already testified all the things that she's had to do for the State to keep the children in her home.  One of them is making sure they go to doctor appointments on time.

The trial court overruled the objection and admitted the letter into evidence.

Although the letter was addressed to "Guardian of River" and Foster Mother was his guardian, the letter was still an out of court statement offered for the truth of the matter asserted.  *See* TENN. R. EVID. 801(c).  Therefore, Exhibit 35 constituted hearsay and was not admissible absent an applicable exception to the hearsay rule.  The response provided by DCS fails to identify any exception to the hearsay rule.  Moreover, Exhibit 35 was not properly certified and did not constitute a self-authenticating document under Tenn. R. Evid. 902.  We conclude that the juvenile court abused its discretion in admitting Exhibit 35 into evidence.  This error was harmless, however, because other credible evidence supports the juvenile court's finding that River had a medical condition and that Foster Mother "stepped up for these children and [took] them to doctors' appointments when needed."  Specifically, Foster Mother stated that she took River to the doctor every six months to have his blood drawn and tested.

### E. Timeline.

Mother takes issue with the juvenile court's decision to permit DCS to enter into evidence a timeline depicting Mother's various arrests to show that she continued to incur criminal charges throughout the custodial episode.  During direct examination, Ms. Hargis explained that she created the timeline

> because [Mother's] whereabouts for the majority of this case were unknown and I was presented with a lot of incarcerations throughout the state of Tennessee, as well as the state of Alabama and Mississippi, so I created a timeline to help me gauge where she was, when she was [there], how many days she was not incarcerated.

When DCS moved to enter the timeline into evidence, Mother objected to the document as inadmissible hearsay.  DCS responded that the timeline was admissible under the business records exception because Ms. Hargis had explained why she created the document. The juvenile court overruled the objection and admitted the timeline into evidence.

As previously stated, the business records exception allows for a business record to be introduced by the custodian of those records or by a qualified witness. TENN. R. EVID. 803(6). "Whatever his or her title the witness must be able to testify as to the identity of the record, the mode of preparation, and whether the record was made in the regular course of business at or near the time of the recorded event." *State v. Baker*, 842 S.W.2d 261, 264 (Tenn. Crim. App. 1992). Ms. Hargis identified the timeline and explained how and why it was prepared, but DCS failed to ask her whether creating such a timeline was a regularly conducted DCS practice and whether she created the document near the time of the recorded events. Therefore, DCS failed to establish the requirements for Rule 803(6), and the timeline should not have been admitted into evidence. The admission of this timeline to show that Mother continued to incur criminal charges was harmless error, however, because Mother admitted that she had been arrested multiple times during this case and that she had a pending drug charge at the time of trial.

### F. Expert opinion testimony.

Mother asserts that the juvenile court abused its discretion in allowing the children's therapist, Sarah Poore, to testify regarding why the children needed therapy. Near the outset of her testimony, Ms. Poore was tendered and accepted without objection as an expert witness in the area of children's counseling. She testified that, in determining the issues the children needed to address in therapy, she relied on an intake process and an initial assessment performed by a different therapist. Ms. Poore explained that it was normal to rely on such information from outside sources when determining the issues a patient needs to address in therapy. As Ms. Poore began describing the issues the children presented, Mother objected on the basis of hearsay. The juvenile court overruled the objection and permitted Ms. Poore to testify about the issues the children needed to address when they began therapy.

According to Mother, Ms. Poore should not have been permitted to testify about why the children required counseling because Ms. Poore based her determination on inadmissible hearsay. We respectfully disagree. "An expert witness may base his or her opinion on '(1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field.'" *State v. Smith*, No. E2017-00764-CCA-R3-CD, 2018 WL 3217734, at *5 (Tenn. Crim. App. July 2, 2018) (quoting *State v. Kennedy*, 7 S.W.3d 58, 66 (Tenn. Crim. App. 1999)); *see also* TENN. R. EVID. 703. Tennessee Rule of Evidence 703 "contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, *even if the information would otherwise constitute inadmissible hearsay*." *Smith*, 2018 WL 3217734, at *5 (emphasis added). It is, in fact, common for expert witnesses to base their opinions on reliable but inadmissible facts or data. *Id.* The underlying information is reliable if it is "such that experts in that field reasonably rely on . . . in forming the same kinds of opinions or inferences that the expert in [a particular] case did." *Id.* Thus, as our Supreme Court has stated, "[w]here the expert's testimony is

otherwise reliable and experts in the field would reasonably rely upon such evidence, concerns are more properly addressed through vigorous cross-examination rather than exclusion of the testimony." *State v. Scott*, 275 S.W.3d 395, 409 (Tenn. 2009). Because Ms. Poore relied on statements made by others that are of the sort commonly relied upon by mental health experts, the juvenile court did not err in permitting Ms. Poore to testify regarding the reasons for the children's therapy.

Mother also contends that the juvenile court abused its discretion in permitting Ms. Poore to testify about what the children told her about attending school. Mother objected to the testimony on the basis of hearsay, but the juvenile court permitted the testimony under Tenn. R. Evid. 803(25), which provides an exception to the hearsay rule in the following circumstances:

> Provided that the circumstances indicate trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning . . . termination of parental rights pursuant to Tenn. Code Ann. § 37-1-147 and Tenn. Code Ann. § 36-1-113 . . . .

Educational neglect was one of the reasons the children were removed from Mother's custody. Statements made by the children regarding educational neglect they experienced while in Mother's care may have been admissible under Rule 803(25), but those were not the statements to which Ms. Poore testified. Rather, the children's statements were that, since entering the foster home, "they were actively involved in school with no behavior problems in school, and no grade problems in school." Because these statements were not about abuse or neglect, the juvenile court abused its discretion in admitting them into evidence. We conclude, however, that the admission of these statements was harmless because Foster Mother testified that the children were doing well in school and were no longer exhibiting behavioral problems.

G. Non-expert testimony opinion testimony.

Mother also takes issue with the juvenile court allowing Ms. Hargis to testify about whether she believed Mother's conduct "show[ed] willful abandonment" because Ms. Hargis was not an expert witness. Mother correctly points out that Ms. Hargis was not recognized as an expert witness and, as such, could not give "[t]estimony in the form of an opinion or inference . . . embrac[ing] an ultimate issue to be decided by the trier of fact." TENN. R. EVID. 704; *see also Blackburn v. Murphy*, 737 S.W.2d 529, 531-32 (Tenn. 1987). The juvenile court, however, terminated Mother's parental rights on the ground of abandonment by failure to provide a suitable home, which does not contain a provision relating to willfulness. *See* Tenn. Code Ann. § 36-1-102(1)(A). Thus, any error the juvenile court committed in allowing Ms. Hargis to testify about whether she believed Mother's conduct constituted willfulness was harmless.

- 11 -

H. Irrelevant evidence.

Mother argues that the trial court abused its discretion in allowing the guardian ad litem to question Mother about the removal of other children who were not removed at the same time as Ryder and River and were not subject to this termination proceeding. According to Mother, such evidence should not have been admitted because it was irrelevant to determining whether Mother's parental rights should be terminated. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TENN. R. EVID. 401. When Mother objected to the question's relevance, the guardian ad litem responded that it was relevant to establishing the persistence of conditions ground.

Tennessee Code Annotated section 36-1-113(g)(3) allows a court to terminate a parent's rights when the conditions that necessitated removal persist for six months with little likelihood that those conditions will be remedied. The statute makes no mention of considering time periods prior to the removal. A court may consider a time-period longer than six months, but the conditions must have persisted during the time following the removal. *See* Tenn. Code Ann. § 36-1-113(g)(3). Therefore, evidence regarding the removal of children not at issue in this case was not relevant to this termination proceeding. The error was harmless, however, because, as discussed below, the record contained alternative evidence demonstrating that the conditions necessitating removal persisted.

II. Due process.

Mother challenges the juvenile court's decision to terminate her parental rights based upon the due process clauses contained in the Fifth and Fourteenth Amendments to the United States Constitution and the due process clause contained in article I, section 8 of the Tennessee Constitution. The Tennessee Supreme Court has consistently interpreted article I, section 8 "as conferring identical due process protections as its federal counterparts." *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 407 (Tenn. 2013). Due process, under both the federal and state constitutions, provides procedural and substantive protections. *Id.*

A. Procedural due process.

Mother contends that the juvenile court's decision terminating her parental rights should be reversed because the court's application of evidentiary rules deprived her of procedural due process. "'The most basic principle underpinning procedural due process is that individuals be given an opportunity to have their legal claims heard at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Lynch v. City of Jellico*, 205 S.W.3d 384,

391 (Tenn. 2006)). When determining whether this principle has been satisfied, courts consider the following three factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* (quoting *Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 732 (Tenn. 2012)). Additionally, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Here, we must determine whether the juvenile court's application of evidentiary rules deprived Mother of the benefit of having her claims heard at a meaningful time and in a meaningful manner. The private interest at stake is Mother's right to the care, custody, and control of her children. The state's interest is, of course, the welfare of the children. Thus, the procedural issue is whether the juvenile court's erroneously admitting certain pieces of evidence deprived Mother an opportunity to defend against the claims in the termination petition. A thorough review of the record shows that, although it may have erroneously admitted some pieces of evidence, the juvenile court admitted and considered sufficient competent evidence to render the erroneous evidence redundant, cumulative, and harmless. Additionally, the juvenile court allowed Mother to present arguments and to introduce proof contradicting that presented by DCS. Mother was not deprived of an opportunity to be heard at meaningful time and in a meaningful manner. We conclude, therefore, that Mother was not deprived of her procedural due process rights.

B. Substantive due process.

Mother also asserts that the juvenile court's decision terminating her parental rights should be reversed because the court's erroneous application of evidentiary rules denied her substantive due process. Substantive due process "'bars oppressive government action regardless of the fairness of the procedures used to implement the action.'" *In re Walwyn*, 531 S.W.3d 131, 138-39 (Tenn. 2017) (quoting *Mansell*, 417 S.W.3d at 409). This doctrine "has been used to protect rights such as the right to marry, have children, and make child-rearing decisions." *Id.* at 139. Courts divide substantive due process claims into two categories: "(1) deprivations of a fundamental constitutional guarantee, and (2) government actions that are 'arbitrary, or conscience shocking, in a constitutional sense.'" *Mansell*, 417 S.W.3d at 409 (quoting *Lynch*, 205 S.W.3d at 392).

Mother contends that the juvenile court's decision to terminate her parental rights deprived her of her fundamental right to the care, custody, and control of her children

because the court's decision was "based on severely lacking proof." Mother correctly points out that her right to the care, custody, and control of her children constitutes a fundamental right. *See Stanley*, 405 U.S. at 651; *In re Angela E.*, 303 S.W.3d at 249-50. We disagree, however, that the juvenile court deprived her of substantive due process by terminating her parental rights after making particular evidentiary decisions. Although the juvenile court admittedly erred in allowing certain inadmissible evidence into the record, alternative evidence in the record that was properly admitted clearly and convincingly supports the juvenile court's decision. Notably, Mother provided much of the admissible evidence because she admitted that she continued abusing illegal substances and incurring criminal charges. This argument is without merit.

III.   Grounds for termination.

A.   Abandonment by failure to provide a suitable home.

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A) provides five alternative definitions of "abandonment," but only the definition provided in subsection (ii) is relevant in this case. That subsection defines "abandonment" as:

> (*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal,

- 14 -

when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

For purposes of this ground, DCS must make "reasonable efforts" to assist parents in obtaining a suitable home by using its "'superior insight and training.'" *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015) (quoting *State Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008)). To be considered reasonable, the Department's efforts need not be "Herculean," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014), but they must be equal to or greater than those of the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*c*).

A suitable home requires "'more than a proper physical living location.'" *In re Daniel B., Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention must be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, 2014 WL 2587397, at *9. Compliance with assessments and counseling is "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009).

The juvenile court removed the children and placed them in DCS custody on May 5, 2017. After an adjudication hearing in July 2017, the juvenile court entered an order finding both that the children were dependent and neglected and that DCS had made reasonable efforts to prevent their removal. Thus, the Department established the first two requirements of this ground for termination. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*a*), (*b*).

Regarding the statute's third requirement, we have previously stated that DCS "may establish this ground by offering proof of reasonable efforts during *any four-month period* following a child's removal." *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *11 n.13 (Tenn. Ct. App. Apr. 11, 2018); *see also In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020). Here, Mother was not incarcerated between March and June 2018. During that four-month period, DCS attempted to locate Mother in order to assist her with establishing a suitable home. Specifically, the case manager called Mother twice at her last reported telephone number, and the case manager called the Genesis House in Cumberland County where Mother was purportedly staying. The case manager also called the Fentress County Sheriff's Department to request assistance in determining Mother's whereabouts. Despite

- 15 -

these numerous efforts, DCS was unable to locate Mother during the relevant four-month period.

By contrast, during the nearly two years following the children's removal, Mother made little effort to find appropriate housing. Throughout this case, Mother claimed that she owned a home. When DCS visited the home, however, it was dilapidated and appeared not to have been lived in for some time. At trial, Mother admitted that she had not lived in that home for nearly two years because she had been traveling to various places in the Southeast. Mother later told DCS that she was renting a home from a landlord who permitted her to live there rent-free in exchange for renovations, but she failed to provide any supporting documentation. Similarly, Mother failed to make the lifestyle changes necessary for her to safely parent. She continued to incur arrests and charges for possession of illegal substances throughout this custodial episode, and she failed to address her mental health issues. Mother started at least one treatment program, but she failed to submit proof that she completed that program or any similar program. Based on the foregoing evidence, we conclude that the efforts by DCS exceeded any efforts by Mother.

In sum, there is clear and convincing evidence in the record that Mother demonstrated a lacked of concern for the children to such a degree that there is little likelihood that she would be able to establish a suitable home in the near future. The trial court did not err in terminating Mother's parental rights based on this ground for termination.

B. Substantial noncompliance.

The trial court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2), which provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 643, 656 (Tenn. Ct. App. 2004). Conditions that make foster care placement necessary may "include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The court must then determine whether the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

The initial permanency plan, dated June 13, 2017, required Mother to complete the following requirements: (1) obtain appropriate housing, (2) abstain from illegal substances

and provide proof of a drug-free home, (3) not obtain any new legal charges, (4) submit to a psychological evaluation with a parenting component and complete any recommendations, and (5) attend all visitations with her children. The second permanency plan, dated December 14, 2017, added the following requirements: (1) sign release of information to allow DCS to monitor her progress with providers, (2) submit to announced and unannounced drug screens and test negative for illegal substances, (3) submit to an alcohol and drug assessment, (4) provide proof of stable employment or means of legal support for the children, (5) communicate with DCS, by phone calls or texts, at least once a week, (6) allow DCS to conduct unannounced home visits, and (7) abide by all laws and prevent further incarcerations.

The juvenile court ratified both plans and found that the requirements of both plans were reasonable and related to remedying the conditions that necessitated foster care for the children. The children entered foster care primarily due to Mother's lack of housing, substance abuse problems, and mental health issues. We agree with the juvenile court that the requirements of the plans were reasonable and necessary to remedying these concerns.

During the nearly two years between the children's removal and trial, Mother made little to no effort to address the permanency plans' requirements. As previously discussed, Mother claimed to own a home but admitted that it was in a dilapidated condition because she had not lived there in two years. Mother also claimed that she lived in a home where the landlord allowed her to live rent-free in exchange for home renovations, but she never provided proof to DCS regarding this claim. In fact, she refused to provide DCS with that property's address or the address of any other property where she may have resided. Therefore, DCS was never able to verify that Mother had obtained stable housing.

Mother failed to address her substance abuse and mental health issues. She admitted to using drugs in 2018 and continued accruing criminal charges while the children were in DCS custody. At the time of the termination hearing, Mother had a pending charge for possession of methamphetamine that she incurred while incarcerated for another charge. She stated that she submitted to an alcohol and drug assessment while at an inpatient treatment facility. She failed to provide any documentation supporting this claim, however, and she failed to sign a release to allow DCS to obtain any such documentation. Mother further stated that she submitted to a psychological evaluation when the Fentress County Sheriff's Department sent her to a treatment facility following a suicide attempt during one of her incarcerations. Once again, however, she failed to provide any supporting documentation. In light of the foregoing, we conclude that the juvenile court properly terminated Mother's parental rights pursuant to this ground.

- 17 -

C. Persistence of conditions.

The juvenile court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).

The persistence of conditions ground "focuse[s] on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005). The purpose behind this ground for termination is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533, 555 (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). Therefore, the question we must answer is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Here, there is no dispute that the children were removed from Mother's custody by order of the juvenile court based on a petition for dependency and neglect. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A). The children were removed due to Mother's lack of housing,

substance abuse problems, and mental health issues.  During the nearly two years following the removal, Mother did virtually nothing to address these issues.  At the time of removal, Mother was incarcerated and, at the time of trial, Mother was incarcerated yet again.  She never provided DCS with proof that she had obtained stable housing.  Indeed, she refused to provide DCS with an address to visit so it could verify that she had housing.  Mother similarly failed to address her substance abuse issues.  She admitted to using drugs in 2018 and, at the time of trial, she had pending charges for possession of methamphetamine.  Although Mother stated that she had entered a treatment program, she failed to provide any documentation showing she completed that program or any similar program.  Mother also failed to provide any proof that she completed a mental health evaluation.

The continuation of the parent and child relationship in this case would greatly diminish the children's chances of integrating into a permanent home.  By the time of the termination hearing, the children had been living with Foster Mother for approximately one year.  Foster Mother testified that the children were "fearful" and had some behavioral issues when they were first placed in her home.  Those issues improved after the children began attending therapy regularly.  Ryder began doing well in school and made friends.  Both children bonded with Foster Mother and her two biological children.  Foster Mother stated that, to accommodate the children, she adjusted her life and built an addition onto her home.  Furthermore, she expressed a desire to adopt the children if they become available for adoption.  We conclude that the juvenile court did not err in terminating Mother's parental rights pursuant to this ground.

### D.  Failure to manifest an ability and willingness to assume custody.

Finally, the juvenile court found that DCS had proven by clear and convincing evidence that Mother's parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(14).  This ground requires a party to prove two elements by clear and convincing evidence.  *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14).  First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]."  Tenn. Code Ann. § 36-1-113(g)(14).  Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]."  Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights need only prove that a parent failed to manifest either an ability or a willingness to assume custody. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13-14 (Tenn. Ct. App. June 20, 2018)).  Here, Mother desired to reunite with her children, but her actions failed to demonstrate an ability or a willingness to assume custody of them.  *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019) (holding that the parents' desire to reunite with their children was insufficient to demonstrate a willingness

or an ability). For instance, she claimed to own a home and to be renting another home, but she failed to provide any proof that either of these homes was suitable for the children. She refused to even provide DCS with an address for those properties or any other property. Mother disappeared for much of the nearly two years following the removal because she was traveling to various states in the Southeast. Thus, for much of this case, DCS could only locate Mother when she was incarcerated. At the time of the termination hearing, Mother was incarcerated and had a pending charge for possession of methamphetamine that she incurred while incarcerated for another charge. Furthermore, she completed virtually none of the permanency plans' requirements and failed to address her mental health and substance abuse issues.

Regarding the second prong, the evidence in the record demonstrates that placing the children in Mother's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). "Substantial harm" requires "'a real hazard or danger that is not minor, trivial, or insignificant'" and, "'[w]hile the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). Given that Mother failed to address her mental health and substance abuse issues, placing the children with Mother poses a substantial risk of exposing them to drug use. Moreover, Mother was again incarcerated at the time of trial and had failed to provide DCS with the address of a suitable home in which the children could live with her once she was released from jail.

For the aforementioned reasons, we conclude that the juvenile court did not err in finding that DCS proved this ground by clear and convincing evidence.

III. Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at

555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the nine factors enumerated in Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof," *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

After considering all of the best interest factors, the juvenile court found that the factors favored terminating Mother's parental rights. *See* Tenn. Code Ann. § 36-1-113(i). The evidence in the record before us does not preponderate against the juvenile court's findings of fact.

The first best interest factor considers whether a parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). As discussed in detail above, Mother failed to demonstrate that she could provide a suitable home for the children. Moreover, at the time of trial, she was once again incarcerated and had failed to address her substance abuse and mental health issues. She offered no proof that she had completed an alcohol and drug assessment or proof that she had completed a treatment program.

The second best interest factor focuses on a parent's potential for lasting change by examining "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2). Mother asserts that this factor does not favor terminating her parental rights because DCS did not make any effort to assist her in reuniting with her children. We respectfully disagree. During the twenty-one months prior to trial, DCS made numerous attempts to contact Mother via phone calls and messages on Facebook to assist her with the requirements of the permanency plans. Mother never responded. Instead, she disappeared for the majority of this case so she could gallivant across the Southeast. The only time DCS could locate her to provide her with any assistance was during her various incarcerations. Thus, the record shows that DCS expended far more effort than Mother. Under this set of circumstances, the Department's efforts were reasonable.

Next, the juvenile court found that the fifth best interest factor was relevant and weighed in favor of termination. This factor considers "[t]he effect a change of caretakers

and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). At the time of trial, the children had been in their current foster placement for approximately one year. The evidence showed that they were thriving in the foster home. Both children had bonded with Foster Mother, and Foster Mother wants to adopt them if they become available for adoption. Conversely, Mother did not have the ability to care for her children because she was incarcerated and had additional pending charges for drug possession. Therefore, changing the children's environment would likely have a negative effect on their "emotional, psychological and medical condition." *Id.*

Finally, the juvenile court found that the seventh factor was relevant and favored termination. Under this factor, a court considers a parent's home environment. *See* Tenn. Code Ann. § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, . . . or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child."). At the time of the termination hearing, Mother was incarcerated. She had failed to address her substance abuse issues and, in fact, was incarcerated due to drug-related charges. Thus, as the juvenile court found, her use of controlled substances rendered her "consistently unable to care for the children in a safe and stable manner."

After considering the entire record, we conclude that the combined weight of the proof establishes by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.

CONCLUSION

We affirm the termination of Mother's parental rights on all grounds and affirm the juvenile court's conclusion that termination of Mother's parental rights was in the children's best interest. Costs of this appeal are assessed against the appellant, Karen C., for which execution may issue if necessary

_/s/ Andy D. Bennett_____
ANDY D. BENNETT, JUDGE